**MURRAY, STONE & WILSON, PLLC**
By:  Matthew T. Stone, Esquire
Attorney Identification No. 206409
One Belmont Avenue, Suite 310
Bala Cynwyd, Pennsylvania 19004
215-947-5300 (telephone)
610-467-2881 (fax)
Email: mstone@mswlawgroup.com
*Attorneys for Plaintiff*

---

### IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **STEVEN BOYKIN**, as Executor for the **ESTATE OF ALVETTA WEBB**, deceased<br>824 East Dorsett Street<br>Philadelphia, PA 19119 | Civil No. |
| Plaintiff, | **COMPLAINT**<br><br>**JURY DEMAND** |
| -vs- | |
| **PLATINUM HEALHCARE GROUP, LLC**<br>65 Jay Street<br>Newark, NJ 07103 | |
| **PLATINUM HEALTH AT WESTGATE, LLC, d/b/a, WESTGATE HILLS REHABILITATION AND NURSING CENTER**<br>2050 Old West Chester Pike<br>Havertown, PA 19083 | |
| **APEX GLOBAL SOLUTIONS, LLC**<br>400 Rella Blvd., Suite 200<br>Montebello, NY 10901 | |
| **APEX HEALTHCARE PARTNERS, LLC**<br>400 Rella Blvd., Suite 200<br>Montebello, NY 10901 | |
| **VINTAGE HEALTHCARE, LLC**<br>400 Rella Blvd., Suite 200<br>Montebello, NY 10901 | |

**PLATINUM PA HOLDINGS, LLC**
c/o Eliyahu Frankel
65 Jay Street
Newark, NJ 07103

**PHWH HOLDINGS LLC**
c/o Vcorp Services, LLC
1013 Centre Road, Suite 403-B
Wilmington, DE 19805

**PRESTIGE HEALTHCARE A.S. LLC**
c/o Vcorp Services, LLC
1013 Centre Road, Suite 403-B
Wilmington, DE 19805

**MARK STERN**
40 Irene Court
Lakewood, NJ 08701

**JACOB KARMEL**
16 New County Road
Airmont, NY 10952

**NATHAN STERN**
1454 Pine Park Avenue
Lakewood, NJ 08701

Defendants.

## COMPLAINT

Plaintiff, Steven Boykin, as Executor of the Estate of Alvetta Webb, deceased, by and through undersigned counsel, Murray, Stone & Wilson, PLLC, files the instant Complaint, and in support thereof avers the following:

### I. PARTIES

#### A. Plaintiff

1.      Alvetta Webb, an adult individual, was a resident at the skilled-nursing facility commonly known as Westgate Hills Rehabilitation and Nursing Center (hereinafter "the Facility"

or "Westgate").

2.      Alvetta Webb died on November 4, 2020.

3.      Steven Boykin was appointed the Executor of the Estate of Alvetta Webb by the Register of Wills of Philadelphia County, Pennsylvania on June 7, 2021.

4.      The Estate of Alvetta Webb is domiciled in the Commonwealth of Pennsylvania.

### B.      Defendants

5.      Based on their membership, each of the entities named as a Defendants herein are residents of the States of New York, New Jersey, and/or Delaware.

6.      Defendant Mark Stern is a resident of the state of New Jersey.

7.      Defendant Jacob Karmel is a resident of the State of New York.

8.      Defendant Nathan Stern is a resident of the state of New Jersey.

9.      Defendant, Platinum Health at Westgate, LLC, d/b/a, Westgate Hills Rehabilitation and Nursing Center, is engaged in the business of owning, operating and/or managing nursing homes, including Westgate Hills Rehabilitation and Nursing Center, providing healthcare, medical services, therapy, rehabilitation, skilled nursing care, and custodial care to the public in Pennsylvania; and was at all times material hereto, duly licensed to operate same in the Commonwealth of Pennsylvania; and was the employer, supervisor and/or partner of all other Defendants noted herein, holding itself and its agents, employees, servants, contractors, subcontractors, staff and/or partners, and those persons granted privileges at the Facility, out to the public as competent and skillful healthcare providers and practitioners of medicine; and which is personally, directly and vicariously liable, among other things for the acts and omissions of itself, its agents, employees, servants, contractors, subcontractors, staff and/or partners and all other

Defendants, all of whom played a role in the care provided to Alvetta Webb and in the operation of the Facility.

10.     Defendants Platinum Healthcare Group, LLC; Apex Global Solutions, LLC; Apex Healthcare Partners, LLC; Vintage Healthcare, LLC; Platinum PA Holdings, LLC; 2050 Old West Chester Pike, LLC; PHWH Holdings LLC; and Prestige Healthcare A.S. LLC are just some of the limited liability companies that the owners and controllers of the Platinum/Apex nursing-home enterprise, including Mark Stern, Jacob Karmel, and Nathan Stern, utilized to own, operate, manage, and control Westgate Hills Rehabilitation and Nursing Center (as well as other skilled nursing facilities) during Alvetta Webb's residency at Westgate.

11.     Defendants Mark Stern, Jacob Karmel, and Nathan Stern are individuals who joined together with the co-Defendants herein, and others, to own, operate, manage, control and direct the Defendants during all times relevant to this matter.

12.     The Defendants herein worked in concert to ensure that entities controlled by Mark Stern, Jacob Karmel, and Nathan Stern would operate and control Westgate during Alvetta Webb's residency.

13.     In an effort to avoid liabilities and as a risk management strategy, the Defendants collectively orchestrated themselves into a confusing, multi-tiered organizational structure whereby the operation and management of Westgate was split amongst many different entities, including the Defendants herein.

14.     This splitting of duties and responsibilities amongst the Defendants was done to avoid the creation of a single entity that might be held liable for the negligence and recklessness of Westgate and its owners and operators.

15.     In an effort to make this splitting of duties appear legitimate, the Defendants and their principals signed contracts with themselves and with their own colleagues, paid fees and rents to companies they also owned and controlled, and otherwise made arrangements that were intended to appear arms-length but which were, in fact, inside and interested.

16.     As a result, the agreements between the various Defendants are non-market transactions that were designed to enrich a small set of individuals sitting at the top and/or to the side of the Defendants, including but not limited to Mark Stern, Jacob Karmel, and Nathan Stern.

17.     Based on the way that the Defendants herein elected to organize themselves, Westgate was left in a position such that it could not operate or function as a skilled-nursing facility without the contributions, roles, and efforts of the Defendants herein.

18.     At all times material hereto, the Defendants individually and collectively owed duties, some of which were non-delegable, to the residents of Westgate, including to Alvetta Webb, such duties being conferred by statute, existing at common law, and/or being voluntarily assumed by each Defendant.

19.     At all times material hereto, the Defendants individually and collectively, and/or through a joint venture, owned, operated, managed and controlled Westgate, and are individually and collectively engaged in the business of providing healthcare, medical services, therapy, rehabilitation, skilled nursing care, and custodial care services to the general public.

## II. <u>JURISDICTION AND VENUE</u>

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as complete diversity exists among the parties herein and the amount in controversy exceeds $75,000.00.  The cause(s) of action all arose in the Eastern District of Pennsylvania.

### III.  FACTUAL BACKGROUND

### A.  Conduct of the Defendants

21.     Prior to her discharge and death, Alvetta Webb was a resident of the Defendants' Facility, Westgate.

22.     Alvetta Webb was incapable of independently providing for all of her daily care and personal needs without reliable assistance.  In exchange for financial consideration, she was admitted to Defendants' Facility to obtain such care and protection.

23.     The Defendants, through advertising, marketing campaigns, promotional materials and information sheets, held out themselves and the Facility as being able to provide medical, skilled nursing, rehabilitation, therapy and custodial care services to elderly and frail individuals, including Alvetta Webb.

24.     Defendants assumed responsibility for Alvetta Webb's total healthcare, including the provision of nutrition, hydration, activities of daily living, medical, skilled nursing, rehabilitation, and therapy.

25.     Defendants further assumed responsibility to provide Alvetta Webb with ordinary custodial and hygiene services.

26.     Defendants exercised complete and total control over the healthcare of all residents of the Facility, including Alvetta Webb.

27.     Defendants were vertically integrated organizations that were controlled by their respective members, managers and/or boards of directors, who were responsible for the operation, planning, management and quality control of the Facility.

28.     The control exercised over the Facility by the Defendants included, inter alia: cash management; cost control; setting staffing levels; budgeting; marketing; maintaining and

increasing census; supervision of the Facility's administrator and director of nursing; supervision and oversight of the staff; development and implementation of nursing staff in-services; development and implementation of all pertinent policy and procedures; monitoring customer satisfaction; performing mock surveys; risk management; corporate and regulatory compliance; quality of care assessment; licensure and certification; controlling accounts payable and receivable; development and implementation of reimbursement strategies; retaining contract management, physician, therapy and dietary services; dictating census and payor source quotas for admissions to the facility; and employing the Facility-level, regional and corporate staff who together operated the Facility.

29.     Defendants, by and through their respective members, managers, board of directors and corporate officers, utilized survey results and various other reports, including quality indicators, to monitor the care being provided at their nursing homes, including the Facility.

30.     Defendants exercised ultimate authority over all budgets and had final approval over the allocation of resources for staffing, supplies, and operations of their nursing homes including the Facility.

31.     As a part of their duties and responsibilities, Defendants had an obligation to establish policies and procedures that addressed the needs of the residents of the Facility, including Alvetta Webb, with respect to the recognition and/or treatment of medical conditions, such as those experienced by Alvetta Webb, so as to ensure that timely and appropriate care was provided for such conditions whether within the Facility, or obtained from other medical providers.

32.     Defendants, acting through their administrators, members, managers, board of directors and corporate officers, were responsible for supervising the standard of professional practice by the members of their staff at the Facility, including regarding the conduct at issue

herein.

33.     Defendants had an obligation to employ competent, qualified and trained staff so as to ensure that proper care, treatment and services were rendered to individuals having medical, nursing and/or custodial needs, such as those presented by Alvetta Webb as set forth herein.

34.     As a part of their duties and responsibilities, Defendants had an obligation to maintain and manage the Facility with adequate staff and sufficient resources to ensure the timely recognition and appropriate treatment of the medical, nursing and/or custodial needs of the residents, such as Alvetta Webb, whether within the Facility, or obtained from other medical care providers.

35.     Defendants made a conscious decision to operate and/or manage the Facility so as to maximize profits at the expense of the care required to be provided to their residents, including Alvetta Webb.

36.     In their efforts to maximize profits, Defendants negligently, intentionally and/or recklessly mismanaged and/or reduced staffing levels below the level necessary to provide adequate care to the residents.

37.     Despite their knowledge of the likelihood of harm due to insufficient staffing levels, and despite complaints from staff members about insufficient staffing levels, Defendants recklessly and/or negligently disregarded the consequences of their actions, and/or negligently caused staffing levels at the Facility to be set at a level such that the personnel on duty could not and did not meet the needs of the Facility's residents, including Alvetta Webb.

38.     Defendants intentionally increased the number of sick, elderly and frail residents with greater health problems requiring more complex medical care.

39.     Defendants knew that this increase in the acuity care levels of the resident

population would substantially increase the need for staff, services, and supplies necessary for the new resident population.

40.     Defendants knew, or should have known, that the acuity needs of the residents in their nursing homes increased and, therefore, the required resources also increased, including the need for additional nursing staff to meet the needs of the residents, including Alvetta Webb.

41.     Defendants failed to provide the resources necessary, including sufficient staff, to meet the needs of the residents, including Alvetta Webb.

42.     Defendants knowingly established staffing levels that created recklessly high resident to staff ratios, including high resident to nurse ratios and high resident to nurse aide ratios.

43.     Defendants knowingly disregarded patient acuity levels while making staffing decisions, and also knowingly disregarded the minimum time required by the staff to perform essential day-to-day functions and treatments.

44.     The acts and omissions of the Defendants were motivated by a desire to increase the profits of the nursing homes they own, including the Facility, by knowingly, recklessly, and with total disregard for the health and safety of the residents, reducing expenditures for needed staffing, training, supervision, and care to levels that would inevitably lead to severe injuries, such as those suffered by Alvetta Webb.

45.     The actions of the Defendants were designed to increase reimbursements by governmental programs, which, upon information and belief, are the primary source of income for the Facility.

46.     The aforementioned acts directly caused injury to Alvetta Webb and were known by the Defendants.

47.     Defendants knowingly sacrificed the quality of care received by all residents,

including Alvetta Webb, by failing to manage, care, monitor, document, chart, prevent, diagnose and/or treat the injuries and illnesses suffered by Alvetta Webb, as described herein, which included a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death.

48.     At the time and place of the incidents hereinafter described, the Facility whereupon the incidents occurred was individually, collectively, and/or through a joint venture, owned, possessed, controlled, managed, operated and maintained under the exclusive control of the Defendants.

49.     At all times material hereto, the Defendants were operating personally or through their agents, servants, workers, employees, contractors, subcontractors, staff, and/or principals, who acted with actual, apparent and/or ostensible authority, and all of whom were acting within the course and scope of their employment and under the direct and exclusive control of the Defendants.

50.     The aforementioned incidents were caused solely and exclusively by reason of the negligence, carelessness and recklessness of the Defendants, their agents, servants, contractors, subcontractors, staff and/or employees and was due in no part to any act or failure to act on the part of Alvetta Webb.

51.     Defendants, their agents, servants, contractors, subcontractors, staff and/or employees are/were, at all times material hereto, licensed professionals/professional corporations and/or businesses and the Plaintiff is asserting professional liability claims against them.

52.     In addition to all other claims and demands for damages set forth herein, Plaintiff is asserting claims for ordinary negligence, custodial neglect and corporate negligence against the Defendants herein, as each of the entities named as Defendants herein are directly and vicariously

liable for their independent acts of negligence, for their acts of general negligence, and for their acts of general corporate negligence.

**B.      Injuries to Alvetta Webb at the Facility**

53.      Upon admission to the Facility and during the relevant time period, Alvetta Webb was dependent upon the staff for her physical, mental, psycho-social, medical, nursing and custodial needs, requiring total assistance with activities of daily living, and she had various illnesses and conditions that required evaluation and treatment.

54.      Alvetta Webb was at risk for future illnesses and injuries, including falls.

55.      Defendants engaged in a pattern of care replete with harmful and injurious commissions, omissions and neglect as described herein.

56.      Defendants deprived Alvetta Webb of adequate care, treatment, food, water and medicine and caused her to suffer numerous illnesses and injuries, which included a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death.

57.      The severity of the negligence inflicted upon Alvetta Webb by the Defendants, accelerated the deterioration of her health and physical condition, and resulted in physical and emotional injuries that caused her severe pain, suffering and mental anguish, together with unnecessary hospitalizations, and death.

58.      These injuries, as well as the conduct specified herein, caused Alvetta Webb to suffer a loss of personal dignity, together with degradation, anguish and emotional trauma.

59.      Upon admission to Westgate on August 14, 2020 and thereafter, Alvetta Webb was assessed withing having poor safety awareness, cognitive decline, and poor bed mobility, and was prescribed Lovenox daily, all of which increase her risk of falls.

60.     Despite her condition, Defendants failed to implement appropriate fall-prevention measures and failed to ensure that their staff were properly assisting and transferring Alvetta Webb as needed.

61.     On September 8, 2020, Ms. Webb was transferred to a new room in the Facility with which she was unfamiliar with her new surroundings.  In addition, there is no documentation indicating that Ms. Webb had access to her call bell in this new, unfamiliar room and that the call bell was within reach to alert staff of her needs.

62.     Ms. Webb sustained a fall that same day and was discovered on the floor of her room.  Ms. Webb was initially assessed and no bleeding or injuries were noted and she was placed back in bed.  At some point, however, a follow-up exam was supposedly conducted which revealed a 3 x 3 cm left forehead hematoma and Ms. Webb was repeatedly pointing to the hematoma.

63.     Ms. Webb was emergently transferred to Lankenau Hospital for further evaluation approximately one and a half hours after she was initially discovered on the floor.

64.     Ms. Webb arrived at the emergency department at Lankenau Hospital at 2:55 p.m. and was reportedly pointing to her head when asked what "hurts."  Ms. Webb underwent a CT scan which revealed a left hemispheric subdural hematoma and she was admitted to the trauma ICU.

65.     Ms. Webb underwent a repeat CT scan which revealed, within hours, that there had been a severe increase in the size of the subdural hematoma.  The new findings of increased intracranial hemorrhaging were critical and life threatening, however, Ms. Webb was deemed a poor candidate for surgery.

66.     On September 10, 2020, Ms. Webb was discharged home to the care of her family, home health, and hospice.

67.     Ultimately, Alvetta Webb was unable to overcome the degradation of her condition caused by the injuries she suffered at Westgate Hills Rehabilitation and Nursing Center, leading to and causing her death on November 4, 2020.

68.     Defendants accepted Alvetta Webb as a resident fully aware of her medical history and understood the level of nursing care she required.

69.     Alvetta Webb's chart includes and evidences missing and incomplete documentation.

70.     The severity of the negligence inflicted upon Alvetta Webb by the Defendants' mismanagement, improper/under-budgeting, understaffing of the Facility and lack of training or supervision of the Facility's employees, failure to provide adequate and appropriate health care; engaging in incomplete, inconsistent and inaccurate documentation; failure to develop an appropriate care plan; failure to ensure the highest level of physical, mental and psychosocial functioning was attained; failure to provide proper medication; and failure to provide sufficient food and water, causing Alvetta Webb to suffer a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death.

71.     As a result of the negligence, carelessness, and recklessness of the Defendants herein described, Alvetta Webb was caused to suffer serious and permanent injuries as described herein, to, in and about her body and possible aggravation and/or activation of any pre-existing conditions, illnesses, ailments, or diseases she had, and/or the accelerated deterioration of her health, physical and mental condition, and a loss of the ordinary pleasures of life, a loss of dignity, humiliation, and more particularly, a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial

neglect, and ultimately, death, along with other body pain and damage, as well as anxiety, reaction and injury to her nerves and nervous system, some or all of which were permanent, together with other medical complications.

## COUNT ONE:  NEGLIGENCE

72.      Plaintiff incorporates herein by reference the preceding paragraphs as though the same were more fully set forth at length herein.

73.      Upon accepting Alvetta Webb as a resident at the Facility, Defendants individually and jointly assumed direct, non-delegable duties to Alvetta Webb to provide her with adequate and appropriate healthcare, as well as basic custodial and hygiene services, as set forth herein.

74.      If Defendants were unable or unwilling to meet the needs of Alvetta Webb, they had an affirmative duty and legal obligation to discharge Alvetta Webb from the Facility.

75.      Defendants had the ultimate responsibility of ensuring that the rights of the residents, including Alvetta Webb, were protected.

76.      Defendants owed a non-delegable duty to provide adequate and appropriate medical, skilled nursing, rehabilitation, therapy and custodial care services and supervision to Alvetta Webb and other residents, such as reasonable caregivers would provide under similar circumstances.

77.      Defendants each owed a non-delegable duty to the Facility's residents, including Alvetta Webb, to hire, train, and supervise their employees so as to ensure that the Facility was operated and services were provided to Defendants' residents in a safe and reasonable manner.

78.      Defendants, by and through their agents, employees, and/or servants each owed a duty of care to Alvetta Webb to exercise the appropriate skill and care of licensed physicians, nurses, nurse aides, directors of nursing, and/or nursing home administrators.

79.     Defendants each owed a duty and responsibility to furnish Alvetta Webb with appropriate and competent medical, skilled nursing, rehabilitation, therapy and custodial care services.

80.     Defendants each owed and failed to fulfill the following duties to Alvetta Webb:

a.      the duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

b.      to select, train and retain only competent staff;

c.      to oversee and supervise all persons who practiced nursing, medical and/or skilled healthcare within the Facility;

d.      to staff the facility with personnel sufficient both in number and in training to provide the care and services required by the Facility's residents;

e.      to ensure that the Facility's residents were treated with dignity and respect;

f.      to maintain sufficient funding, staffing and resources for the Facility so that its residents were provided with the care and services they required;

g.      to formulate, adopt, and enforce rules, procedures and policies to ensure quality care and healthcare for all residents, and to update the same as required by the applicable standards of care;

h.      to take adequate measures to rectify known problems in the delivery of hygiene and custodial services as well as in the delivery of medical, skilled nursing, rehabilitation, and therapy care;

i.      to warn residents, their family and/or representatives of the Defendants' inability to provide adequate care and services when Defendants knew or should have known of their deficiencies in providing such care and services;

j.      to refuse admission to residents to whom they knew or should have known they could not provide reasonable care and services;

k.      to not admit more residents than to whom Defendants could safely provide adequate care and services;

l.      to keep the Facility's residents free from physical and mental abuse and neglect;

m.      to provide a safe, decent and clean living environment for the Facility's

residents;

n.   and to assist the residents in retaining and exercising all of the Constitutional, civil and legal rights to which they are entitled as citizens of the United States and of the Commonwealth of Pennsylvania.

81.   In addition to the direct acts and omissions of the corporate Defendants, the Defendants also acted through their agents, servants and employees, who were in turn acting within the course and scope of their employment under the direct supervision and control of the Defendants.

82.   Defendants each authored, produced and/or received frequent reports detailing the number and types of injuries, illnesses, and infections sustained by Alvetta Webb and the residents in the Facility.

83.   Despite being made aware of the types and frequency of injuries and/or illnesses, many of which were preventable, sustained by the residents of the Facility, including those suffered by Alvetta Webb, Defendants failed to take steps to prevent the occurrence of said injuries, illnesses, and/or infections.

84.   The Defendants knew, or should have known, of the aforementioned problems that were occurring with the care of Alvetta Webb, as they were placed on actual and/or constructive notice of said problems, through Defendants' own reports and through governmental/state surveys.

85.   Defendants, as the corporate members, managers, owners, and/or directors of the Facility, breached their duties and were, therefore, negligent, careless and reckless in their obligations to Alvetta Webb.

86.   The corporate conduct of the Defendants was independent of the negligent conduct of the employees of the Facility, and was outrageous, willful, and wanton, and exhibited a reckless indifference to the health and well-being of the residents, including Alvetta Webb.

87.   The breaches of duties, general negligence, professional negligence, corporate

16

negligence, carelessness and recklessness of the Defendants, individually, vicariously and/or acting by and through their officers, directors, members, managers, physicians, physicians' assistants, nurses, nurses aides, regional and corporate staff who examined, treated and/or communicated the condition of Alvetta Webb, and through the administrative personnel responsible for hiring, retaining and/or dismissing staff, staff supervision and policy-making and enforcement, as well as any agents, servants, employees, contractors, subcontractors and/or consultants of the Defendants were exhibited in the following acts and omissions in the care and treatment of Alvetta Webb:

    a.    failure to hire, utilize, train and retain sufficient staff to meet the residents' needs, including those of Alvetta Webb, which caused Alvetta Webb to suffer a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death;

    b.    failure to provide sufficient measures, supervision and assistance to prevent Alvetta Webb from suffering falls and accidents;

    c.    failure to timely transfer Alvetta Webb to a hospital when her condition required the same;

    d.    failure to ensure that Alvetta Webb did not needlessly suffer from preventable and treatable pain;

    e.    failure to ensure that Alvetta Webb received her physician-ordered medications in accordance with her physicians' orders;

    f.    failure to ensure that Alvetta Webb received her physician-ordered treatments in accordance with her physicians' orders;

    g.    failure to timely and appropriately notify Alvetta Webb's physician(s) and consulting specialists when she experienced significant changes in her condition, contributing to Alvetta Webb's injuries and illnesses, including a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death;

    h.    failure to obtain new or modified physician orders when Alvetta Webb's changes in condition required the same;

i.      failure to timely and appropriately notify Alvetta Webb's family and personal representatives when she experienced significant changes in her condition, contributing to Alvetta Webb's injuries and illnesses, including a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death;

j.      failure to accurately and consistently document Alvetta Webb's needs and the care and services provided to her in response to such needs;

k.      failure to ensure that Alvetta Webb did not develop serious and permanent injuries to, in and about her  body and possible aggravation and/or activation of any pre-existing conditions, illnesses, ailments, or diseases she had, and/or accelerated the deterioration of her  health, physical and mental condition, and more particularly, when she suffered a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death;

l.      failure to respond in a timely manner with appropriate medical, nursing and custodial care when Alvetta Webb was injured, including when she experienced a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death, when Defendants knew or should have known that Alvetta Webb was at risk for the same;

m.     failure to ensure that each resident, including Alvetta Webb, received, and that the Facility provided, the necessary care and services to attain or maintain the highest practicable physical, mental and psychosocial well-being, in accordance with the comprehensive assessment and plan of care;

n.      failure to ensure that the Defendants used the results of its assessments to develop, review and revise Alvetta Webb's comprehensive plan of care,

o.      failure to develop, implement and administer to Alvetta Webb an appropriate, comprehensive and individualized care plan that included measurable objectives and timetables to meet her  medical, nursing, custodial, mental and psychosocial needs that are identified in the comprehensive assessment, describing the services that were to be furnished to attain or maintain her highest practicable physical, mental, and psychosocial well-being, causing Alvetta Webb to suffer a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death;

p.      failure to ensure that the Facility had sufficient nursing staff to provide nursing and custodial care and services to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident, including Alvetta Webb, as determined by the residents' assessments and individual plans of care, and the

failure to provide services by sufficient number of each of the required types of personnel on a twenty-four hour basis to provide nursing care to all residents, including Alvetta Webb, in accordance with the residents' care plans;

q.      failure to administer the Facility in a manner that enabled it to use its resources effectively and efficiently to attain or maintain the highest practicable physical, mental, and psychosocial well-being of each resident;

r.      failure to ensure that the services provided or arranged by the Facility were provided by qualified persons in accordance with each resident's written plan of care;

s.      failure to oversee and supervise all persons who practiced nursing and/or skilled healthcare in the Facility who failed to provide adequate and appropriate health care to prevent Alvetta Webb from suffering from a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death;

t.      failure to formulate, adopt and enforce adequate rules, procedures and policies to prevent Alvetta Webb from suffering a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death;

u.      failure to refer Alvetta Webb to the necessary medical specialists in a timely manner who would have properly diagnosed and/or treated her condition;

v.      failure to provide Alvetta Webb with the necessary care and services to allow her to attain or maintain the highest practicable physical, mental and psychological well-being;

w.      failure to implement a budget that properly funded the Facility and allowed the Facility to provide adequate and appropriate healthcare to Alvetta Webb, including adequate staff and supplies;

x.      grossly understaffing the Facility;

y.      failure to take appropriate steps to remedy continuing problems at the Facility that Defendants knew were occurring with Alvetta Webb's care, which included the need to increase the number of employees, hiring skilled and/or trained employees, adequately training the current employees, monitoring the conduct of the employees, and/or changing the current policies and procedures to improve resident care;

z.      failure to maintain compliance with the governmental regulations to which Defendants' delivery of care is compared as part of the annual and complaint state survey process performed by the Pennsylvania Department of Health; and,

aa.    in committing the acts and omissions herein, acting in a grossly negligent manner, with reckless indifference to the rights and safety of Alvetta Webb.

88.    Upon information and belief, Defendants' owners, officers, directors, partners, members and managers were made aware of governmental/state survey results and placed on notice of the status of their nursing homes, including the Facility.

89.    Upon information and belief, the Defendants, including their owners, officers, directors, partners, members, managers and employees, knew that they had been cited by governmental units regarding Westgate Hills Rehabilitation and Nursing Center's failure to ensure that each resident received the necessary physician's orders at the time of admission related to diabetes treatments; failure to develop, review or revise plans of care for five residents; failure to adhere to acceptable standards of nursing practice related to medication administration; failure to follow physicians orders and failure to provide adequate assessment and monitoring related to IV care; failure to provide a clean, comfortable environment on two of two nursing units; failure to complete comprehensive assessments that accurately reflected the residents' status; failure to incorporate individualized medical approaches into the comprehensive care plan; failure to ensure that a resident received appropriate care and services following a fall, and failure to provide an effective infection control program related to annual policy review and wound care treatments,

90.    As a direct and proximate result of the Defendants' acts and omissions, and their breach of the duty of care, negligence, carelessness and recklessness, Alvetta Webb suffered (a) severe permanent physical injuries resulting in pain, suffering, disfigurement and death, (b) mental anguish, embarrassment, humiliation, degradation, emotional distress, and loss of personal dignity, (c) loss of capacity for enjoyment of life, and (d) expense of otherwise unnecessary hospitalizations and medical care.

91.     In causing the aforementioned injuries, the Defendants knew, or should have known, that Alvetta Webb would suffer such harm.

92.     At all times pertinent hereto, there was in full force and effect 18 Pa.C.S.A. §2713 "Neglect of Care Dependent Person," which set forth penal consequences for neglect of a care-dependent person.

93.     18 Pa.C.S.A. §2713 "Neglect of Care Dependent Person" expresses the fundamental public policy of the Commonwealth of Pennsylvania that elders, like children, are not to be abused or neglected, particularly in health care facilities or by persons holding themselves out as trained professionals, and that if such abuse or neglect causes injury, either physical or mental, then such conduct is actionable.

94.     At all times pertinent hereto, Alvetta Webb was a care dependent resident of the Defendants' Facility, and thus fell within the class of persons 18 Pa.C.S.A. §2713 "Neglect of Care Dependent Person" was intended to protect, thus entitling Plaintiff to adopt 18 Pa.C.S.A. §2713 "Neglect of Care Dependent Person" as the standard of care for measuring the Defendants' conduct.

95.     Additionally, 18 Pa.C.S.A. §2713 "Neglect of Care Dependent Person" is directed, at least in part, to obviate the specific kind of harm which Alvetta Webb sustained.

96.     The Defendants, in accepting the responsibility for caring for Alvetta Webb as aforesaid, were negligent "per se" and violated 18 Pa.C.S.A. §2713 "Neglect of Care Dependent Person" in that they:

    a.     failed to provide treatment, care, goods and services necessary to preserve the health, safety or welfare of Alvetta Webb for whom they were responsible to provide care as specifically set forth in this Complaint;

97.     At all times pertinent hereto, there was in full force and effect 35 P.S. §10225.101, *et seq.*, "Pennsylvania Older Adults Protective Services Act," which sets forth civil penalties, administrative penalties and other consequences for abuse of a care-dependent person.

98.     35 P.S. §10225.102, expresses the policy of the Commonwealth of Pennsylvania that:

> …older adults who lack the capacity to protect themselves and are at imminent risk of abuse, neglect, exploitation or abandonment shall have access to and be provided with services necessary to protect their health, safety and welfare.  It is not the purpose of this act to place restrictions upon the personal liberty of incapacitated older adults, but this act should be liberally construed to assure the availability of protective services to all older adults in need of them. Such services shall safeguard the rights of incapacitated older adults while protecting them from abuse, neglect, exploitation and abandonment.  It is the intent of the General Assembly to provide for the detection and reduction, correction or elimination of abuse, neglect, exploitation and abandonment, and to establish a program of protective services for older adults in need of them.

99.     At all times pertinent hereto, Alvetta Webb was an older person who was a resident of Defendants' Facility, who lacked the capacity to protect herself and thus fell within the class of persons 35 P.S. §10225.101, *et seq.* was intended to protect, thus entitling Plaintiff to adopt 35 P.S. §10225.101, *et seq.* as the standard of care for measuring the Defendants' conduct.

100.    Additionally, the Pennsylvania Older Adults Protective Services Act is directed, at least in part, to obviate the specific kind of harm which Alvetta Webb sustained.

101.    In addition to the aforesaid negligence, which said negligence is specifically incorporated herein, the Defendants, in accepting the responsibility for caring for Alvetta Webb as aforesaid, were negligent "per se" and violated 35 P.S. §10225.101, *et seq.* in that they had reasonable cause to suspect that Alvetta Webb was the victim of abuse or neglect and failed to report said abuse and neglect to the appropriate agency and law enforcement officials.

102.     As a direct result of the aforesaid negligence "per se" of the Defendants, Alvetta Webb was caused to sustain serious personal injuries and damages as aforesaid.

103.     The conduct of the Defendants was intentional, outrageous, willful and wanton, and exhibited a reckless indifference to the health and well-being of Alvetta Webb.

104.     The conduct of the Defendants was such that an award of punitive damages is justified.

WHEREFORE, Plaintiff, Steven Boykin, Executor of the Estate of Alvetta Webb, deceased, respectfully requests that judgment be entered in Plaintiff's favor, and against all Defendants, in an amount in excess of the compulsory arbitration limits and/or Fifty Thousand Dollars ($50,000.00) whichever is greater, together with punitive damages, costs, and any other relief that this Honorable Court deems appropriate given the circumstances.   A jury trial is demanded.

## COUNT TWO:  SURVIVAL STATUTE

105.     Plaintiff hereby incorporates by reference the preceding paragraphs as though the same were more fully set forth at length herein.

106.     Plaintiff brings this action on behalf of the decedent's estate under and by virtue of the Pennsylvania Judiciary Act 42 Pa.C.S. 8302, known as the Survival Statute, to recover all damages legally appropriate thereunder.

107.     The following persons are entitled to share under this cause of action in the estate of said decedent, Alvetta Webb: Steven Boykin (son) and Gregory Boykin (son).

108.     Plaintiff's decedent, Alvetta Webb, did not bring any action during her lifetime, nor has any other action been commenced on behalf of Plaintiff's decedent, Alvetta Webb, against the Defendants herein.

109.    Plaintiff claims damages for the conscious pain and suffering including mental and physical pain, suffering and inconvenience, loss of life's pleasures and aggravation of pre-existing medical conditions, and expense of otherwise unnecessary hospitalizations undergone by Alvetta Webb, up to and including the time of her death, which was caused by the Defendants' breach of duties, negligence, carelessness and recklessness.

110.    Plaintiff claims damages for the fright and mental suffering attributable to the peril leading to the physical manifestation of mental injuries, physical injuries, a catastrophic fall resulting in a subdural hematoma and intracranial hemorrhage, delay in treatment of her head injuries, pain mismanagement, custodial neglect, and ultimately, death, which occurred to Alvetta Webb, and which was caused by the Defendants' breaches of duties, negligence, carelessness and recklessness.

111.    In causing the aforementioned injuries, the Defendants knew, or should have known, that Alvetta Webb would suffer such harm.

112.    The conduct of the Defendants was intentional, outrageous, willful and wanton and exhibited a reckless indifference to the health and well-being of Alvetta Webb.

113.    The conduct of the Defendants was such that an award of punitive damages is justified.

WHEREFORE, Plaintiff, Steven Boykin, Executor of the Estate of Alvetta Webb, deceased, respectfully requests that judgment be entered in Plaintiff's favor, and against all Defendants, in an amount in excess of the compulsory arbitration limits and/or Fifty Thousand Dollars ($50,000.00) whichever is greater, together with punitive damages, costs, and any other relief that this Honorable Court deems appropriate given the circumstances.   A jury trial is demanded.

## COUNT THREE:  WRONGFUL DEATH

114.    Plaintiff hereby incorporates by reference the preceding paragraphs as though the same were fully set forth at length herein.

115.    Plaintiff brings this action on behalf of the decedent's estate under and by virtue of the Pennsylvania Judiciary Act 42 Pa.C.S. 8301, known as the Wrongful Death Statute, to recover all damages legally appropriate thereunder.

116.    The following persons are entitled to share under this cause of action in the estate of said decedent, Alvetta Webb: Steven Boykin (son) and Gregory Boykin (son).

117.    Plaintiff's decedent, Alvetta Webb, did not bring any action during her lifetime, nor has any other action been commenced on behalf of Alvetta Webb, deceased, against the Defendants herein.

118.    Plaintiff claims damages for the pecuniary loss suffered by the decedent's survivors by reason of the death of Alvetta Webb, deceased, as well as for the reimbursement of hospital, nursing, medical, and funeral expenses, and expenses of administration and other expenses incurred in connection therewith.

119.    As a result of the death of Alvetta Webb, deceased, the survivors, as aforesaid, have been deprived of the companionship, comfort, aid, assistance and society that they would have received from Alvetta Webb, for the remainder of her natural life.

WHEREFORE, Plaintiff, Steven Boykin, Executor of the Estate of Alvetta Webb, deceased, respectfully requests that judgment be entered in Plaintiff's favor, and against all Defendants, in an amount in excess of the compulsory arbitration limits and/or Fifty Thousand Dollars ($50,000.00) whichever is greater, together with punitive damages, costs, and any other

relief that this Honorable Court deems appropriate given the circumstances.   A jury trial is demanded.

Respectfully Submitted,

Dated:  July 27, 2022          BY:      /s/ Matthew T. Stone
                                        Matthew T. Stone, Esquire
                                        Pennsylvania Attorney ID No. 206409
                                        **MURRAY, STONE & WILSON, PLLC**
                                        One Belmont Avenue, Suite 310
                                        Bala Cynwyd, PA  19004
                                        Telephone:  215-947-5300
                                        Facsimile:  610-467-2881
                                        Email:  mstone@mswlawgroup.com
                                        *Attorneys for Plaintiff*