**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **STEVEN BOYKIN,** as Executor for the ESTATE OF ALVETTA WEBB, deceased,<br><br>Plaintiff,<br><br>*v.*<br><br>**PLATINUM HEALTHCARE GROUP, LLC et al.,**<br><br>Defendants. | **CIVIL ACTION**<br><br>**NO. 22-2939-KSM** |

## MEMORANDUM

**Marston, J.** **January 31, 2024**

Plaintiff Steven Boykin, as executor for the estate of his mother, Alvetta Webb, brought forth the instant lawsuit against the Westgate Hills Rehabilitation and Nursing Center ("Westgate") and related entities and individuals, alleging that the facility's negligence caused the premature death of his mother. (Doc. No. 1.) On June 26, 2023, the parties reached a settlement agreement. (Doc. No. 40.) Because this agreement settles a claim on behalf of an estate and purports to settle both the wrongful death claim (Count III) and survival action (Count II) for a single amount, Pennsylvania law requires court approval before the settlement becomes effective.[1] *See* 20 Pa. Cons. Stat. § 3323 (requiring court approval by either the Pennsylvania Orphans Court or the court in which the action is pending of any settlement of claims by or against an estate); *Moore v. Gates*, 580 A.2d 1138, 1141 (Pa. Super. Ct. 1990) (outlining that

[1] United States Magistrate Judge Carol Sandra Moore Wells assisted the parties in reaching their settlement agreement and then issued an order dismissing the case with prejudice pursuant to Rule 41.1(b) of this Court's Local Rules of Civil Procedure. (Doc. No. 40.) However, because the settlement agreement requires the District Court Judge's approval, the Court vacated the Rule 41.1(b) order. (Doc. No. 44.)

"[b]efore a survival claim can be settled on behalf of a decedent's estate" and or before wrongful death and survival actions can be "settled for a single amount," the settlement "must be judicially approved"). Accordingly, before the Court is Plaintiff's Motion to Settle. (Doc. No. 41.) For the reasons set forth in this Memorandum, the Court grants Plaintiff's Motion and approves the settlement in its entirety.

## I. Factual Background

Alvetta Webb was a seventy-year-old resident of Westgate, a skilled nursing facility purportedly owned and operated by the named Defendants.[2] (Doc. No. 1 at ¶ 1; Revised Rule 26(f) Report at 2 (stating Ms. Webb's age).) As a resident of Defendants' facility, Ms. Webb depended on staff to assist with her daily living and medical care. (Doc. No. 1 at ¶¶ 24–25.) Plaintiff alleges that Defendants fell short of providing adequate care to Ms. Webb in a litany of ways and that they operated their business in a manner that prioritized profits over their residents. (*Id.* at ¶¶ 35–37, 56.)

The specific incident at the center of the Complaint occurred on September 8, 2020, just three-and-a-half weeks after Ms. Webb was admitted to Westgate. (*Id.* at ¶¶ 59, 61.) Ms. Webb had previously been assessed as having "poor safety awareness, cognitive decline, and poor bed mobility." (*Id.* at ¶ 59.) She also took Lovenox on a daily basis, "which increase[d] her risk of falls." (*Id.*) Nevertheless, she was moved to a new, unfamiliar room in the facility. (*Id.* at ¶ 61.) It is unclear whether this new room provided access to a call bell that Ms. Webb could use to gain the staff's attention. (*Id.*) The same day that she was transferred to her new room, Ms. Webb sustained a serious fall. (*Id.* at ¶ 62.) When staff arrived, they found her on the ground,

---

[2] These factual allegations are included in the Complaint. The Court understands that the Defendants contest liability and causation in this case (Doc. No. 41 at ¶ 7) and that the parties had begun discovery which could have undercut the veracity of these allegations.

but did not note any bleeding or injuries. (*Id.*) However, a follow up examination revealed that Ms. Webb was suffering from a 3x3 cm hematoma on her forehead. (*Id.*)

Ms. Webb was emergently transferred to Lankenau Hospital where she arrived approximately an hour and a half after she was discovered on the floor. (*Id.* at ¶ 63.) Once there, she underwent a CT scan which revealed a "left hemispheric subdural hematoma." (*Id.* at ¶ 64.) After being admitted to the trauma ICU, Ms. Webb underwent an additional CT scan, which revealed that there had been an increase in the size of the subdural hematoma, rendering the injury life-threatening. (*Id.* at ¶¶ 64–65.) However, because Ms. Webb was a poor candidate for surgery, she was discharged on September 10, 2020 to the care of her family, home health and hospice. (*Id.* at ¶¶ 65–66.) Roughly two months later, on November 4, 2020, Ms. Webb passed away. (*Id.* at ¶ 67.)

Plaintiff, as executor of Ms. Webb's estate, brought forth the instant lawsuit alleging that Westgate, its owners, and related entities are responsible for the degradation of Ms. Webb's condition and her eventual death. The Complaint included claims for negligence, wrongful death, and a survival action. (Doc. No. 1.) After conducting some portion of discovery, (Doc. No. 41-10) and following a settlement conference with Magistrate Judge Wells, the parties settled their suit. (Doc. No. 40.) While Defendants deny liability, they agree to pay $225,000 in exchange for a release. (Doc. No. 41 at ¶¶ 7, 10.) As detailed in Plaintiff's motion, the proposed distribution of these settlement funds is as follows:

| | |
|---|---|
| TO: Murray, Stone & Wilson, PLLC:<br>Counsel Fees, per Fee Contract | $90,000.00 |
| TO: Murray, Stone & Wilson, PLLC<br>Reimbursement of Costs, per Fee Contract | $4,890.93 |
| TO: Murray, Stone & Wilson, PLLC<br>Skarlatos & Zonarich – Probate Costs | $12,294.66 |

| | |
|---|---|
| TO: Murray, Stone & Wilson, PLLC<br>Cost Retainer | $1,000.00 |
| TO: Murray, Stone & Wilson, PLLC – Escrow Account<br>Maximum Estimated Medicare lien | $10,889.73 |
| TO: Murray, Stone & Wilson, PLLC – Escrow Account<br>Maximum Estimated Medicaid lien | $17.80 |
| TO: Murray, Stone & Wilson, PLLC – Escrow<br>(Professional fees for lien resolution) | $700.00 |
| **BALANCE:** | **$105,206.88** |
| WRONGFUL DEATH (100%)<br>TO: Steven Boykin (son)<br>TO: Gregory Boykin (son) | $105,206.88<br>$52,603.44<br>$52,603.44 |

(Doc. No. 41-1.)[3] The Court ordered, and Plaintiff provided, supplemental briefing regarding the appropriateness Plaintiff's proposed allocation between the wrongful death and survival action and the reasonableness of Plaintiff's litigation and probate counsel's fees. (Doc. Nos. 45, 46.) The Court also held a hearing to inquire about the same. (Doc. 45.)

## II. Legal Analysis

Section 3323 of Pennsylvania's Probate, Estates, and Fiduciaries Code requires court approval of any settlement involving claims brought on behalf of or against an estate. *See* 20 Pa. Cons. Stat. § 3323(a). This includes survival actions. *See Moore*, 580 A.2d at 1141 ("Before a survival claim can be settled on behalf of a decedent's estate, . . . such a settlement must be judicially approved."); *Schuster v. Reeves*, 589 A.2d 731, 734 (Pa. Super. Ct. 1991) ("The

[3] The values outlined above differ slightly from Plaintiff's initial proposal. (Doc. No. 41-1.) In Plaintiff's opening brief and initial proposed order, he stated that probate counsel, Skarlatos Zonarich, had accrued $11,859.52 in fees and costs. (Doc. No. 41 at ¶ 16; Doc. No. 41-1; Doc. No. 41-11.) However, as reflected in Plaintiff's supplemental briefing, a more complete invoice submitted by Skarlatos Zonarich revealed that their fees and costs were in fact $12,294.66. (Doc. No. 46 at 4; Doc. No. 46-3.) Having received confirmation from the parties that $12,294.66 is the correct value for the Court's review, the Court has updated the remaining distribution to accord with this increase.

survival action . . . was a claim on behalf of the decedent estate, and it could not be settled without court approval. Without such approval the attempt to settle and release the estate's claims was ineffective."). Relatedly, "where wrongful death and survival actions are settled for a single amount, the amount apportioned to the survival action must be approved by a court having jurisdiction." *Moore*, 580 A.2d at 1141. As the Court in which this action was pending, we have such jurisdiction under § 3323(b). 20 Pa. Cons. Stat. § 3323(b)(1) ("Whenever it is desired to compromise or settle an action in which damages are sought to be recovered on behalf of an estate, any court or division thereof in which such action is pending and which has jurisdiction thereof may . . . make an order approving such compromise or settlement."); *Moore*, 580 A.2d at 1141 ("Where a survival action is pending, . . . a settlement thereof may be approved by the court in which it is pending . . . .").

The requirement of court approval "is intended to protect the estate, as well as the creditors and beneficiaries thereof." *Moore*, 580 A.2d at 1141; *see also Soares v. McClosky*, 466 F. Supp. 703, 707 (E.D. Pa. 1979) (explaining that § 3323 "serves several substantive ends: it protects potential beneficiaries, assures that the taxing authority gets its due, and shelters the decedent's representative from subsequent liability by eliciting a judicial determination whether a proposed settlement (or other termination) sufficiently protects the decedent's estate"). It follows that "a court may refuse to approve a settlement of a survival action which is inadequate." *Moore*, 580 A.2d at 1141.

In approving the proposed settlement of a survival action, the Court may also "approve an agreement for the payment of counsel fees and other proper expenses incident to such action." 20 Pa. Cons. Stat. § 3323(b)(1). Therefore, approval of Plaintiff's petition requires determinations as to: 1) the adequacy of the proposed settlement amount; 2) the reasonableness

of the proposed apportionment of the settlement amount between the wrongful death and survival action claims; 3) the reasonableness of the attorneys' fees and costs requested; and 4) the reasonableness of the remaining distribution. The Court addresses each in turn.

**A. Adequacy of the Settlement Amount**

The Court turns first to whether the proposed settlement amount is adequate. Section 3323 "contemplates a judicial inquiry into the propriety of a proposed compromise or settlement by the estate, whether or not it is contested, consistent with the court's supervisory jurisdiction over decedents' estates, and an adjudication based thereon." *Krause v. B&O R.R.*, 33 Pa. D. & C.3d 458, 466 (Pa. Ct. Comm. Pl. 1983); *Tamasy v. Yough Sch. Dist.*, 2:18-cv-01236-NR, 2019 WL 5864893, at *1 (W.D. Pa. Nov. 8, 2019). In performing this inquiry, the court must "exercise independent judgment on the whole case," and decide whether the proposed settlement is "fair and reasonable under the circumstances." *Krause*, 33 Pa. D. & C.3d at 467 (quotation marks omitted). Because "[t]he court must independently evaluate the proposed settlement petition," the petition must "provide the court with sufficient information on which to base its determination," including "all relevant facts and the reasons why the administrator of the . . . estate believes the settlement is desirable and why it is in the estate's best interest to settle the action." *Rodi v. Williams*, Civil Action No. 4:12–1379, 2015 WL 1863006, at *2 (M.D. Pa. Apr. 23, 2015) (quotation marks omitted and alterations adopted). "Relevant facts include how many medical bills and liens regarding the care of the deceased . . . are to be handled by the settlement." *Id.* In determining whether the proposed amount is adequate, courts also must analyze the strengths and weaknesses of the particular case, including whether the plaintiffs face any "issues of proof that could hamstring their efforts to establish liability." *Tamasy*, 2019 WL 5864893, at *2.

Here, the parties settled for $225,000. (Doc. No. 41 at ¶ 10.) In determining whether this amount is adequate, the Court gives '"considerable weight' to the consensus of parties represented by counsel because the lawyers and parties are closer to the case and have a better handle on the risks and upsides of the litigation." *Carter v. Wellpath LLC*, No. 2:22-CV-01050-JDW, 2023 WL 6323095, at *1 (E.D. Pa. Sept. 28, 2023) (quoting *Matter of McLean Contracting*, No. 14-cv-5676, 2017 WL 2618855, at *1 (E.D. Pa. June 16, 2017)); (*see also* Doc. No. 41 at ¶ 20 (outlining Plaintiff's counsel's view that the proposed settlement is "reasonable and is in the best interests of the Estate and wrongful death beneficiaries").[4] This consideration is particularly weighty here where the parties' settlement negotiations were aided by the venerable Magistrate Judge Wells, who has extensive experience assisting parties reach mutually beneficial settlement agreements. *See Carter*, 2023 WL 6323095, at *1 (finding significant that the parties participated in good faith negotiations in front of a Magistrate Judge); *Leto v. Illum*, No. CV 20-884, 2021 WL 2186238, at *3 (E.D. Pa. May 28, 2021) (same).

The Court's independent review of the Complaint suggests that that there is no reason to second guess the parties' judgment here. While the Court does not have the benefit of any discovery that took place after the Complaint was filed, there appear to be substantial questions regarding the care and attentiveness provided to Ms. Webb during her short tenure at Westgate. Nevertheless, Plaintiff's claims still faced significant hurdles, including demonstrating that the Defendants could have done more to prevent Ms. Webb's injury and that these failures caused Ms. Webb's death. And even if Plaintiff succeeded in overcoming these challenges, given that Ms. Webb was elderly, it is likely that any compensatory damages received would have been limited. Thus, while the settlement amount is not extraordinarily high, the Court finds that it is

[4] Defense counsel likewise asserted during a hearing before the Court on January 18, 2024, that they believe this settlement was appropriate due to the risks associated with proving liability in this case.

appropriate in light of the difficulties and risks Plaintiff may have faced in successfully litigating this case. *See In re Hughes Estate*, 59 Pa. D. & C.2d 680, 682 (Pa. Ct. Comm. Pl. 1972) ("We have no difficulty in approving the amount of the settlement" because the "risk of recovering something less than the amount achieved [$284,250] by the settlement was a serious one.").

Moreover, the costs associated with fully litigating this matter suggest that the proposed settlement properly values this case. *See Romano v. United States*, No. CV 20-1852-KSM, 2020 WL 7364453, at *3 (E.D. Pa. Dec. 15, 2020) (providing that the Court must consider not only the strength and weaknesses of each side's case but also the costs associated with litigation). Along with whatever fact discovery remained, the parties' Rule 26(f) report provided that each side intended to retain experts for liability, causation, and forensic accounting. (*See* Revised Rule 26(f) Report at 4.) The retention, preparation, and examination of these three experts likely would have been an expensive process that would have eaten into any award Plaintiff received. (*See* Doc. No. 41-5 at ¶ 2 (outlining that Plaintiff was responsible for "costs associated with expert witnesses" if any recovery occurred).)

Considering the risks and expenses associated with fully litigating this matter, the Court concludes that $225,000 is an adequate amount to settle Plaintiff's claims.

**B. Allocation of Proceeds**

Having determined that the settlement amount is adequate, the Court now turns to the proposed allocation of the settlement funds between the survival action and wrongful death claim. Although a close call, the Court finds that Plaintiff's proposal to allocate 100% of the settlement proceeds to the wrongful death claim is reasonable under the circumstances.

"Wrongful death and survival actions typically are settled together." *Smith v. Sandals Resorts Int'l, Ltd.*, 709 F. Supp. 2d 350, 358 (E.D. Pa. 2010), *aff'd*, 437 F. App'x 178 (3d Cir.

2011). "However, it is necessary to allocate the settlement between the claims," because this can "affect who receives the money and whether taxes are paid on the funds." *Id.*; *see also Moore*, 580 A.2d at 1141 ("[W]here wrongful death and survival actions are settled for a single amount, the amount apportioned to the survival action must be approved by a court having jurisdiction."). While Pennsylvania cases "do not explicitly address settlement allocation formulas, Pennsylvania law clearly delineates the requirements to satisfy a wrongful death and survival action award." *Smith*, 709 F. Supp. 2d at 358. "Survival actions under the Pennsylvania Survival Act, 42 Pa. C.S. § 8302, are brought by the administrator of the estate to benefit the decedent's estate." *Rodi*, 2015 WL 1863006, at *1. "Survival action damages compensate the decedent's estate for losses from the tort," and account for "decedent's pain and suffering, loss of gross earning power from the date of injury until death, and probable earning during his life expectancy minus the probable cost of maintaining himself and wrongful death damages." *Smith*, 709 F. Supp. 2d at 358. "Survival action proceeds are divided among the heirs of the decedent, either through the decedent's will or by the laws of intestate, regardless of pecuniary loss." *Id.* By contrast, wrongful death "damages compensate the spouse, children, or parents of decedent for [their] pecuniary loss, i.e., contributions the decedent would have made for their shelter, food, clothing, medical care, education, entertainment, gifts, and recreation." *Id.* at 356. "Pecuniary loss also includes the pecuniary value of the services, society, and comfort the relatives would have received from the decedent." *Id.*

Along with their different purposes, there are also significant differences in the economic treatment of proceeds received through a survival action and a wrongful death claim. First, damages received through a survival action are for the benefit of the estate and thus may be subject to inheritance or estate tax. *See Walsh v. Strenz*, 63 F. Supp. 2d 548, 551 (M.D. Pa.

1999). Damages received through a wrongful death claim, on the other hand, may be subject to income taxation, but not an estate or inheritance tax. *Id.*; *see also In re Est. of Merryman*, 669 A.2d 1059, 1061 (Pa. Commw. Ct. 1995) ("Awards pursuant to wrongful death claims pass outside of the decedent's taxable probate estate under Pennsylvania's inheritance tax provisions."). Second, any award received through a wrongful death claim is to be received "without liability to creditors of the deceased person." 42 Pa. Cons. Stat. § 8301. Survival action awards have no such limitation. *See generally* 42 Pa. Cons. Stat. § 8302.

Given these different purposes and economic implications, Pennsylvania courts have noted that scrutiny of a proposed settlement is "particularly necessary" where "it [is] proposed to apportion a total settlement so that the major part thereof would be paid to the heirs of the decedent in settlement of the wrongful death action and only a small portion of the settlement would be paid to the decedent's estate in settlement of the survival action." *Moore*, 580 A.2d at 1141. However, at the same time, out of a "natural preference to compensate needy dependents for their loss over having windfall inheritances," Pennsylvania policy "favors wrongful death beneficiaries over estate beneficiaries." *Smith*, 709 F. Supp. 2d at 359 (cleaned up and citations omitted). Thus, "there is nothing inherently suspect or improper about a settlement allocation favoring wrongful death beneficiaries." *Tamasy*, 2019 WL 5864893, at *2–3. Indeed, courts have routinely "approved settlements allocating large percentages to the wrongful death action over the survival action." *Smith*, 709 F. Supp. 2d at 358 (collecting cases).

Here, Plaintiff proposes that 100% of the settlement proceeds be allocated to the wrongful death claim. (Doc. No. 41 at ¶ 18.) Plaintiff justifies this allocation by arguing that it would "maximize the recovery for Ms. Webb's two sons" by allowing them to receive the settlement proceeds without any funds being diverted to creditors of Ms. Webb's estate. (Doc.

No. 46 at 2.) In particular, Plaintiff discovered during the course of litigation that the Pennsylvania Department of Human Services has asserted a significant claim against Ms. Webb's estate in the amount of $402,920.25. (*Id.*) If the settlement proceeds are only allocated to the wrongful death claim, the Pennsylvania Department of Human Services will be unable to receive any of the settlement proceeds as means of paying off Ms. Webb's debts. While the Court appreciates the transparency and understands Plaintiff's motivation to maximize the amount of settlement proceeds that he and his brother take home, the Court is troubled by this justification. After all, one of the reasons why court approval is required for the settlement of survival actions is to protect the estate's creditors. *Moore*, 580 A.2d at 1141.

Nevertheless, the Court finds that there are sufficient facts to support allocating 100% of the settlement proceeds to the wrongful death claim. First, as discussed above, damages for survival actions are intended to "compensate the decedent's estate for losses from the tort," and account for "decedent's pain and suffering, loss of gross earning power from the date of injury until death, and probable earning during his life expectancy." *Smith*, 709 F. Supp. 2d at 358. Here, given that Ms. Webb was a seventy-year-old woman who was admitted to assisted living, her pain and suffering is likely the only loss properly compensated through a survival action. While it seems intuitive that Ms. Webb endured some pain and suffering given that she died two months after the fall at issue, (Doc. No. 1 at ¶¶ 61–62, 67), counsel for both Plaintiff and Defendants argued at a hearing on this motion that Ms. Webb's already deteriorating condition was hardly impacted by her fall. Given counsel's assertion that Ms. Webb endured limited pain and suffering from Defendants' tort, a one-sided allocation is appropriate.

Second, while the proposed allocation would prevent creditors of Ms. Webb's estate from receiving any of the settlement funds, Plaintiff's counsel has assured the Court that these

creditors would not be left without recourse. Instead, it was asserted that Ms. Webb's estate holds sufficient assets, primarily in the form of her home, to satisfy the debt she owes to the Pennsylvania Department of Human Services. Thus, while the proposed allocation favors Ms. Webb's two sons over her creditors, the Court is satisfied that these creditors are adequately protected through other means. Third, the Court finds significant that the Pennsylvania Department of Revenue has approved the 100% allocation, finding the amount at stake too small to warrant deeper scrutiny. (Doc. No. 41-12); *see Hammonds v. Luzerne Cnty.*, No. 3:19-CV-2199, 2020 WL 5517496, at *1 (M.D. Pa. Sept. 14, 2020) (relying on approval by the Department of Revenue in finding allocation appropriate); *Carter*, 2023 WL 6323095, at *1 (same). Last, the Court notes that numerous other courts have approved of settlements allocating all the proceeds to the wrongful death claim over the survival action. *Tamasy*, 2019 WL 5864893, at *2–3 (finding allocation of settlement funds reasonable even though the parties allocated the entire amount to the wrongful death claim); *Rodi*, 2015 WL 1863006, at *3 (same); *Carter*, 2023 WL 6323095, at *1 (same).

In sum, the Court is satisfied that, under the specific facts presented here, allocating all the settlement proceeds to the wrongful death claim is appropriate.

**C. Attorney's Fees**

The Court turns next to the appropriateness of counsel's fees and costs. Plaintiff retained two law firms: Murray, Stone & Wilson, PLLC to litigate this case and Skarlatos and Zonarich to act as probate counsel for Ms. Webb's estate. Murray, Stone & Wilson propose that they should receive $90,000 (40% of the settlement) as legal fees, reimbursement of $4,890.93 in costs, and a retainer of $1,000 for any future costs, which would be returned following resolution of this matter. (Doc. No. 41 at ¶ 15.) These fees and costs are requested pursuant to the fee agreement

that Plaintiff and his counsel agreed to prior to the commencement of this lawsuit. (Doc. No. 41-5.) Skarlatos and Zonarich, on the other hand, request $12,294.66 in fees, expenses, fiduciary tax returns, and future costs reserves, the last of which would be returned at the end of this matter. (Doc. No. 41-11.)

The Court finds these fees and costs reasonable under the circumstances. First, as to Murray, Stone & Wilson's fees, the Court notes that "[w]hen addressing the reasonableness of attorney's fees, 'courts should be . . . reluctant to disturb contingent fee arrangements freely entered into by knowledgeable and competent parties.'" *Carter*, 2023 WL 6323095, at *2 (quoting *Ryan v. Butera, Beausang, Cohen & Brennan*, 193 F.3d 210, 215 (3d Cir. 1999)); *see also Leto*, 2021 WL 2186238, at *3 ("[C]ourts should be reluctant to disturb contingent fee arrangements freely entered into by knowledgeable parties."); *cf. In re Cendant Corp. Litig.*, 264 F.3d 201, 220 (3d Cir. 2001) ("Courts should afford a presumption of reasonableness to fee requests submitted pursuant to an agreement between a properly-selected lead plaintiff and properly-selected lead counsel."). After all, "Plaintiff's counsel took on risk in pursuing this case for which they should be rewarded." *Salas v. Goldenberg*, No. CV 22-2179, 2023 WL 8832422, at *2 (E.D. Pa. Dec. 20, 2023) (alterations adopted). The 40% contingency fee that the parties negotiated before commencing this lawsuit is "within the range of reasonableness" and therefore does not raise concerns. *Hammonds*, 2020 WL 5517496, at *2; *Salas*, 2023 WL 8832422, at *2 (approving a 40% contingency fee agreement when ruling on a proposed settlement). Moreover, it appears that Plaintiff's counsel earned his keep. This was not a case that was settled shortly after the complaint was filed. Rather, it was not until the back half of fact discovery, after numerous depositions had taken place, that the parties reached their settlement agreement following an hours-long mediation session with Judge Wells. (*See* Doc.

No. 41-10) (indicating costs associated with three depositions that took place in April).) Thus, the Court finds that counsel's requested fee is fair and reasonable under the circumstances.

Second, the Court finds that Plaintiff counsel's requested costs of $4,890.93 are reasonable. As was true of counsel's fees, the costs that Plaintiff would cover if there were a successful resolution of this matter were clearly delineated in the fee agreement Plaintiff and his counsel entered before the commencement of this lawsuit. (Doc. No. 41-5.) The Court finds no reason to disturb this agreement that was entered into by intelligent parties. Moreover, the Court's thorough review of Plaintiff's revised invoice (Doc. No. 46-2) reveals that these costs were both appropriately accrued during counsel's representation of Plaintiff and fairly limited for a case that lasted almost a year.

Finally, the Court finds no issue with Skarlatos and Zonarich's requested fees and costs of $12,294.66. A review of the counsel's billing records attached to the supplemental briefing (Doc. No. 46-3) reveals that Skarlatos and Zonarich's work on this matter has been quite extensive, including, among other things, preparing the petition for probate, notifying beneficiaries, verifying asset values, and negotiating with creditors. (Doc. No. 46 at 3–4 (outlining the work completed by probate counsel).) Pairing this work with Skarlatos and Zonarich's sterling reputation, as attested to by both defense and plaintiff's counsel, the Court sees no reason to second guess the propriety of these fees and costs.

**D. The Remaining Distribution**

Finally, the Court finds no issues with the rest of the proposed distribution of the settlement proceeds. Outside of legal fees and costs, three liens were placed on the proceeds. This includes a lien of $10,889.73 by Medicare and a lien of $17.80 by Medicaid. (Doc. No. 41 at ¶ 12.) Counsel asserts that these amounts are subject to change as lien negotiations continue

and that if the amounts are reduced, the excess will be remitted to the beneficiaries. (*Id.*) The final lien is in the amount of $700 by Synergy Lien Resolution Services for negotiating and resolving the two other liens. (*Id.*) Plaintiff's fee agreement with counsel made clear that such costs would be paid from any judgment or settlement that he would receive. (Doc. No. 41-5 at ¶ 5.) After the deduction of these liens, and the various attorneys' fees and costs discussed above, there is a balance of $105,206.88. (Doc. No. 41 at ¶ 17.) Plaintiff proposes that this amount be split evenly between Ms. Webb's two children, Steven and Gregory Boykin such that each receives $52,603.44. (Doc. No. 41-1.) Given that these two individuals are the only close family members of Ms. Webb that the Court is aware of, such a distribution of wrongful death proceeds is fair and reasonable.

## III. Conclusion

In sum, the Court finds that Plaintiff's proposed settlement and apportionment of settlement funds is adequate, fair, and reasonable under the circumstances. An appropriate order follows.